**EMERALD ADVISORS, INC., Plaintiff,**

v.

**INCREDIBLEART.COM, INC. a.k.a Incredible Art, Inc. and Grant Singer & Hamilton Holdings, Inc. Defendants and Third–Party Plaintiffs,**

v.

**Edward Mullen, Third–Party Defendant.**

**No. 01 CIV. 4177(NRB).**

United States District Court, S.D. New York.

Dec. 7, 2001.

Andrew Leslie Margulis, Ropers, Majeski, Kohn & Bentley, New York City, for plaintiff.

Edward C. Kramer, New York City, for defendants.

## MEMORANDUM AND ORDER

BUCHWALD, District Judge.

Plaintiff Emerald Advisors, Inc. ("Emerald" or "plaintiff") brought suit against Incredibleart.com, Inc. a.k.a. Incredible Art, Inc. ("Incredible Art") and Grant, Singer & Hamilton Holdings, Inc. ("GSH") (collectively, "defendants") for breach of contract, fraud, and unjust enrichment, seeking both compensatory and punitive damages.[1] In a Memorandum and Order dated July 24, 2001, we granted defendants' motion to dismiss plaintiff's claim for punitive damages. *Emerald Advisors, Inc. v. Incredibleart.com*, 2001 WL 845444 (S.D.N.Y. July 25, 2001). Defendants subsequently counter-claimed against Emerald for breach of contract and also served a third-party complaint against Edward Mullen, the former President, CEO, director, and majority owner of Incredible Art.

The parties consented to a bench trial, which was held on November 8 and November 15, 2001. The testimony and exhibits introduced at that trial form the basis for the findings of fact herein. For the reasons set forth below, we award Emerald $83,333.32 plus reasonable attorney's fees in an amount to be determined at a later date, and we decline to award any damages to Incredible Art or GSH.

1. Federal jurisdiction is founded on diversity. 28 U.S.C. § 1391(a). Emerald is a Florida corporation whose principal place of business is in Florida. Incredible Art is Delaware corporation whose principal place of business is in New York. GSH is a New York corporation whose principal place of business is in New York.

2. Incredible Art was a closely held corporation as of December 12, 2000. There were only four holders of common stock on that date, and each held a small number of shares relative to those held by Mullen. Specifically,

## I. BACKGROUND

In 1998, Edward Mullen founded Incredible Art, a so-called "dot-com startup" with the goal of selling art on the Internet. As with many other companies of its ilk, Incredible Art had trouble turning a profit, and, by 2000, Mullen began to consider selling the business or ceasing operations. He was able to find a buyer, however, and on December 12, 2000, GSH purchased Incredible Art from Mullen and the other holders of its common stock.[2]

This purchase and sale was effected via a Stock Purchase Agreement ("SPA") dated December 12, 2000. On the same day, Emerald, Mullen, Incredible Art, and GSH entered into an agreement (the "Consulting Agreement") by which Emerald[3] was to provide consulting services to Incredible Art for a one year period (the "consulting period") beginning on December 1, 2000. Consulting Agreement ¶ 2. In return, Incredible Art promised to pay Emerald $100,000 in equal monthly installments, plus business expenses. *Id.* ¶ 4.

During the first two months of the consulting period, Incredible Art made the required monthly payments. It has not, however, made any payments since. Plaintiff claims that Mullen performed under the Consulting Agreement, up until the time it was clear to him that Incredible Art no longer intended to pay him. Pl.'s Complaint ¶¶ 16, 17. Plaintiff asserts

Frank Meyer held 92,806 shares, Geoffrey Mullen (Edward Mullen's brother) held 303,-729 shares, an entity called Lakeside Partners held 151,864 shares, and Edward Mullen held 5,051,601 shares (90% of those outstanding). Consulting Agreement, Disclosure Schedule 4(b)(i).

3. Because the Consulting Agreement states that "Edward Mullen shall be the sole person responsible for fulfilling [Emerald's] duties hereunder," we refer to Emerald and Mullen interchangeably with respect to that Agreement. Consulting Agreement ¶ 2.

that Incredible Art's failure to pay him constitutes a breach of the Consulting Agreement. Plaintiff also asserts that this failure amounted to a breach by GSH, because GSH had guaranteed full payment by Incredible Art. Consulting Agreement ¶ 4.

Defendants vehemently disagree with plaintiff's version of the story. Defendants argue that it was Mullen who breached the Consulting Agreement by, *inter alia*, failing to provide important financial documents and not engaging in the meaningful consultation that the Agreement contemplated. Answer ¶ 13.

We held a bench trial to determine whose version of the facts was more credible. At the outset, we note that all of the witnesses who testified are "interested witnesses." Mullen, the founder and president of Emerald Advisors testified on its behalf. Alex Sakin, Michael Kratz, and Rodney Cadymer, all current employees of Incredible Art, and Michael Membrado, attorney for GSH and Incredible Art, testified for defendants.

At trial, the Court heard radically different versions of the facts from Mullen, on the one hand, and the defense witnesses on the other. Mullen, for example, estimated that he provided 250–300 hours of consulting during the first three months of the consulting period, while the defense witnesses estimated that he worked for fewer than ten hours during that time. While there were some undisputed facts, such as that Mullen traveled, at Incredible Art's expense, from his home in California to New York City in January and again in February, 2001, and that, while there, he stayed at the apartment of Incredible Art

employee Michael Kratz, for the most part the Court heard two completely contradictory stories. Because we conclude that Mullen's version of the facts was consistent, supported by contemporaneous documentation, and, thus, more credible, we find for plaintiff on every issue presented. The following discussion constitutes our findings of fact and conclusions of law.

## II. PLAINTIFF'S CLAIMS [4]

As this is a contract dispute, we must first construe the terms of the relevant contract, the Consulting Agreement, and then analyze the facts to determine which party or parties have breached. Finally, we will address the issue of damages.

### A. Breach of the Consulting Agreement [5]

#### 1. Contract Construction

 The Consulting Agreement sets forth Mullen's obligations to Incredible Art:

The Consulting Services rendered by [Mullen] hereunder shall consist of general consultations with management regarding the business and operations of [Incredible Art], assisting in the training of senior management, assisting [Incredible Art] in developing its marketing and promotions strategy, introducing officers of [Incredible Art] to existing vendors, customers and other persons which [sic, probably "with"] whom [Incredible Art] has existing business relationships, and such other consultations which management may from time to time require during the term of this Agreement, pro-

---

4. As noted above, we have previously granted defendants' motion to dismiss plaintiff's claim for punitive damages. *Emerald Advisors*, 2001 WL 845444. Our discussion, therefore, is limited to plaintiff's remaining claims.

5. We read the first four claims of relief stated in the Complaint as all alleging breach of the Consulting Agreement. The remaining claim is discussed in Part II.B, *infra*.

vided that *during the first three months* of the Consulting Period *[Mullen] shall be reasonably available to provide up to thirty hours* of Consulting Services to [Incredible Art] and, *thereafter,* [Mullen] shall be obligated to render advice *upon the request* of [Incredible Art], in good faith, but shall *not be obligated to spend any specific amount of time* so doing.

Consulting Agreement ¶ 2 (emphasis supplied). Under New York law,[6] an unambiguous written contract should be interpreted "according to its terms." *W.W.W. Associates, Inc. v. Giancontieri,* 77 N.Y.2d 157, 162, 565 N.Y.S.2d 440, 566 N.E.2d 639, 642 (1990). Whether a writing is ambiguous "is a question of law to be resolved by the courts." *Id.* We find that the Consulting Agreement is completely unambiguous and clearly defines the obligations of the parties thereto.

Thus, Mullen was required to make himself "reasonably available" to Incredible Art from December 1, 2000 to March 1, 2001 so that he could provide "up to thirty hours" of consulting services. Consulting Agreement ¶¶ 1, 2. For the remainder of the consulting period, March 1, 2001 to December 1, 2001, he was "obligated to render advice upon the request of [Incredible Art], in good faith, but [was] not [ ] obligated to spend any specific amount of time so doing." *Id.* ¶ 2. Mullen was to consult "at a location of [his own] discretion," but was also to "make himself reasonably available in person [ ] in New York City." *Id.* ¶ 3. Finally, as New York courts generally assume an obligation of good faith and fair dealing, Mullen was required to fulfill his consulting duties in such a manner. *Murphy v. American Home Prods. Corp.,* 58 N.Y.2d 293, 304, 461 N.Y.S.2d 232, 448 N.E.2d 86, 91 (1983)

(citing *Wood v. Lucy, Lady Duff–Gordon,* 222 N.Y. 88, 91, 118 N.E. 214 (1917)).

While it was plaintiff's burden to establish that Mullen complied with these obligations, *Missert v. Rochester Technical Group,* 254 A.D.2d 787, 678 N.Y.S.2d 189, 190 (4th Dep't 1998), we note that this was not a difficult burden to meet. The Consulting Agreement does not set any minimum number of hours that Mullen was obliged to spend consulting for Incredible Art. To the contrary, the Agreement actually capped the number of hours at thirty for the first three months, and "expressly" provided that Mullen was free to render similar services for entities other than Incredible Art. Consulting Agreement ¶¶ 2, 5. Furthermore, this contract created an on-demand relationship between the parties. When Incredible Art asked Mullen to provide consulting services, he was obliged to do so, but, if Incredible Art did not make any requests, Mullen was not required to do anything at all. *Id.* ¶ 2. Thus, to prove that Mullen fully performed under the Consulting Agreement, plaintiff need only show that he reasonably fulfilled all the requests for consulting services actually made by Incredible Art consistent with the hourly cap.

### 2. Facts

This case comes down to a swearing contest, but one with a twist. Mullen testified that he diligently performed each and every task Incredible Art asked of him. Defense witness after defense witness, however, testified that Mullen was not responsive to Incredible Art's repeated requests for consulting services. Mullen claimed that he worked between 250 and 300 hours during the first three months of the consulting period, while the defense witnesses testified that he worked fewer

---

**6.** The Consulting Agreement states that it "shall be governed by and construed and enforced in accordance with the internal laws of the State of New York." *Id.* ¶ 12.

than ten hours during that time. Mullen stated that, on his trips to New York, he went to Incredible Art's offices every day, even on the weekend, while the defense witnesses claimed that Mullen spent his days in New York tending to business and personal affairs of his own.[7]

The twist, however, is that the documentary evidence introduced at trial is entirely consistent with Mullen's version of events, and entirely inconsistent with the account offered by the defense witnesses. As we stated in Part II.A.1, *supra*, Mullen did not have to prove the number of hours he provided to Incredible Art, because there was no set number required of him. All Mullen had to prove was that he reasonably and in good faith performed the tasks Incredible Art asked him to perform. While the defense witnesses claim that Incredible Art asked Mullen to perform tasks that he did not complete to their satisfaction, they can point to no document, whatsoever, to corroborate their testimony. Nor have the defendants introduced any documents that display any criticism at all of Mullen's performance under the Consulting Agreement, except for those written after Mullen threatened to sue the defendants for breach of contract. Plaintiff, on the other hand, offered into evidence numerous documents that support its claim that Mullen was attentive to each and every request made by Incredible Art. The following is a list of documents showing Mullen as responsive and helpful to Incredible Art:

- E-mail (12/8/2000) from Michael Membrado, attorney for GSH and Incredible Art, to Mullen, requesting that Mullen send him a business plan Mullen had drafted. Pl.Ex. 137. Mullen sent the requested document, via e-mail, on the next business day. Pl.Ex. 138.

- E-mail (12/17/2000) from Mullen in response to a request from Alex Sakin, President and CEO of Incredible Art, offering a description of the qualifications potential Incredible Art employees must possess. Pl.Ex. 71.

- E-mail (12/22/2000) from Scott Montell, attorney for GSH and Incredible Art, to Mullen, requesting that Mullen review an attached draft of a letter to potential Incredible Art investors. Pl.Ex. 72. Mullen replied the same day with constructive criticism. Pl.Ex. 74.

- E-mail (1/15/2001) from Michael Kratz, Incredible Art employee, to Mullen, asking him to arrange for a company to ship Incredible Art's equipment from their former office in California to their new office in New York. Pl.Ex. 78. Mullen replied within three minutes, saying that he "will take care of it." Pl.Ex. 79. By the next day, Mullen had packed up three boxes and told Incredible Art how much it would cost to ship. Pl.Ex. 82.

- E-mail (1/25/2001) from Kratz to Mullen asking for advice regarding certain Incredible Art employees' stock options. Pl.Ex. 87. Mullen replied the same day with the requested advice. *Id.*

- E-mail (1/26/2001) to Mullen requesting passwords needed to get Incredible Art up and running at their new offices. Pl. Ex. 98. Mullen replied the next day with the needed passwords. Pl.Ex. 99.

- E-mail (1/31/2001) from Kratz to Mullen stating that Mullen's draft of a company memorandum was so much better than that of the Incredible Art employees, "it was like having A Where's Waldo book

---

7. Witnesses on both sides testified that Mullen traveled to New York City in January and February, 2001, that while there, he spent at least part of his time at the offices of Incredible Art providing the contracted-for consulting services.

on the same shelf as The Professional Chef encyclopedia." Pl.Ex. 103.

- E-mail (3/22/2001) from Membrado to Mullen requesting a telephone call. Pl. Ex. 104. Mullen called Membrado the next day, and "had a very nice conversation," where it was apparently agreed that Membrado was to either call or e-mail Mullen if Membrado or Incredible Art needed Mullen's assistance. Pl. Exs. 105, 106. A week later, Mullen had still not heard back from Membrado, and sent the latter an e-mail to check up on the request for assistance. Pl.Ex. 106. Membrado replied that the delay was his own fault, as he was working on other matters, and thanked Mullen for staying in touch. Pl.Ex. 107. Ten minutes later, Mullen replied and mentioned that he had "not heard from Alex [Sakin] in quite some time, despite my messages." Pl.Ex. 108.

- After Sakin informed Mullen that Incredible Art intended to cease paying him, Mullen wrote a long e-mail to Membrado on 4/12/2001, stating that "I have made trips to New York and been available on a regular basis. I have promptly responded to all requests both verbal and written, and I check in frequently with [Incredible Art] to see if I am needed for consultation or other matters." Pl.Ex. 110.

Significantly, the first time Incredible Art made any written reference to their alleged dissatisfaction with Mullen's performance was in response to a letter from Mullen's attorney threatening suit against Incredible Art and GSH. Pl. Exs. 67, 68. Thus, Mullen's testimony was strongly bolstered by the contemporaneous documentary record.

The testimony of the defense witnesses, on the other hand, was effectively impeached by the documentary evidence introduced as well as by contradictory testimony among them. To name just a few examples:

- Kratz testified that he had a heated conversation with Mullen regarding the sale of Incredible Art's computer equipment to an entity called Z Galleries, Inc. while Mullen was packing up the equipment that was to be sold. Kratz gave a detailed account of this conversation, claiming that he told Mullen that GSH had ordered Mullen "not to sell anything." It is undisputed that this sale took place in November of 2000, see Pl. Exs. 11–13, and that the equipment sold was located in California. Kratz also testified, however, that he moved back to New York in October of 2000. Thus, his testimony is internally inconsistent and renders suspect his remaining testimony which is, in any event, contradicted by his contemporaneous e-mails.

- Mullen testified that he ate numerous meals with the Incredible Art employees. As part of their testimony designed to show how little time Mullen spent at Incredible Art's offices, defense witnesses Kratz and Sakin both testified that Mullen never ate any meals with the other employees of Incredible Art. Defense witness Rodney Cadymer, an Incredible Art employee, contradicted Kratz's and Sakin's testimony, however, when he testified to eating dinner at Katz's Deli with Sakin, Kratz, and Mullen.

- In order to attempt to show that Mullen did not send any financial records to New York, Kratz testified that the boxes sent by Mullen from California contained nothing but "computers and books." During his cross-examination, however, Kratz was shown a hand-written note that he acknowledged was written by him. The note stated, in substance, "these *documents* were shipped by Mullen from California."

• An e-mail (3/24/2001) from Kratz to Mullen stating that clearly impugns the credibility of Membrado. Kratz wrote, "Membrado ... speeks [sic] with A[sic] fork tong [sic] but what else is he supposed to say. He works for us." Pl.Ex. 105.

In sum, having heard the two scenarios, we find the one offered by plaintiff more credible. Specifically, we find that Mullen was responsive to Incredible Art's various requests for consultation services until it was clear that the latter was not going to pay him as required under the Consultation Agreement. *See* Pl.Ex. 110. As this is the limit of Mullen's obligation, we need not make a finding as to the specific number of hours Mullen spent consulting for Incredible Art. *See* Part II.A.1, *supra.*

Further, we find that Incredible Art breached the contract on May 29, 2001, the date of a letter sent from Sakin to Mullen, purporting to terminate the Consulting Agreement "for cause."[8] Pl.Ex. 69; *see* Consulting Agreement ¶ 8. As we have found that Mullen fulfilled his obligations under the Consulting Agreement, we find that Incredible Art terminated the Consulting Agreement for reasons "other than Cause." Consulting Agreement ¶ 8.

### 3. Damages

The Consulting Agreement states, "In the event that [Incredible Art] terminates this Agreement for any reason other than Cause, [Incredible Art] shall pay [Emerald] One Hundred Thousand Dollars ($100,000) and all Expense reimbursements, less any portion of the Consulting Fees and Expenses paid to [Emerald] as of the date of such termination." *Id.* The Consulting Agreement also contains a guarantee that states, "Grant Singer [GSH] hereby irrevocably and unconditionally guarantees to [Emerald] full payment of the Consulting Fees and the Expenses incurred by [Emerald] under this Agreement. In the event that [Incredible Art] fails to timely make any payment of the Consulting Fees or Expenses, Grant Singer shall promptly cause such payment to be made." *Id.* ¶ 4. Based on this guarantee, Incredible Art and GSH are jointly and severally liable for the damages awarded herein.

Incredible Art has already paid Emerald two monthly installments under the Consulting Agreement, for a total of $16,777.68. Thus, under the terms of the Consulting Agreement, defendants must pay Emerald $100,000 less $16,666.68, or $83,333.32. Consulting Agreement ¶ 8. Defendants shall also pay interest on this sum, at a rate of 9% per annum, accruing from May 29, 2001, the date on which Emerald's cause of action for breach of the Consulting Agreement came into existence. N.Y. C.P.L.R. § 5001(b). Defendants are jointly and severally liable for these damages.

Furthermore, the Consulting Agreement provides that "[i]n the event of any disputes, the prevailing party shall be entitled to reimbursement for all legal and other fees." *Id.* ¶ 12. Emerald is the prevailing party in this action, but has not produced evidence as to the amount of fees it expended in prosecuting this case. If the parties are not able to promptly stipulate to an amount of attorney's fees, plaintiff's counsel should support his claim for attorney's fees by affidavit with supporting records. If the attorney's fee arrangement between Emerald and its counsel is a contingent one, a copy of the retainer agree-

---

**8.** The Consulting Agreement provides that it "may be terminated only for 'Cause.'" *Id.* ¶ 8. "Cause" is defined as "willful misconduct on the part of [Mullen] or a material breach of [Mullen's] duties as set forth in Section 2 hereof." *Id.*

ment and an affidavit in support of any other fees claimed shall be submitted forthwith. If some other fee arrangement is in place, then supporting documentation for the arrangement shall be submitted, as well as time records, invoices, and support for any other fees sought. The defendants are jointly and severally liable for these fees.

### B. Breach of Stock Purchase Agreement

■ Prior to the sale of Incredible Art to GSH, MBNA America issued a business credit card (the "MBNA credit card") to Incredible Art, which was personally guaranteed by Mullen. Disclosure Schedule 4(g) of the SPA lists Incredible Art's liabilities at the time of the closing, December 12, 2000. SPA at 22. Furthermore, these liabilities were to remain with Incredible Art following the transfer of stock ownership at the closing. *Cf.* SPA ¶ 4(g). On that Schedule, it was disclosed that Incredible Art owed $882.84 on the MBNA credit card. *Id.* It was also disclosed that "[a]n additional approx. $7,200 has been billed by MBNA. This amount is incorrect in our opinion and has been disputed." *Id.* Incredible Art has apparently not settled this liability with MBNA, and penalties and interest have since accrued. MBNA has, therefore, sought payment from Mullen, as guarantor. Pl. Exs. 143–145.

Plaintiff[9] claims that this liability is owed by Incredible Art, and that its refusal to pay constitutes a breach of the SPA. Defendants counter that the MBNA credit card was improperly used by Mullen to pay for personal expenses, and, therefore, Incredible Art should not be liable for those expenses. Defendants have not, however, introduced any evidence to prove their assertion. Moreover, the liability was disclosed in the SPA, and defendants had an opportunity to raise any questions as to its propriety at that time, but chose not to do so. We find that the MBNA credit card debt is properly a liability of Incredible Art.[10]

### III. THIRD PARTY CLAIMS

We turn next to the third party claims brought by Incredible Art and GSH against Mullen in his individual capacity.

### A. Third Party Claim for Misappropriation of Corporate Funds

■ The first third party claim contains numerous allegations that Mullen violated his fiduciary duty to Incredible Art during the time he was the President, CEO, director, and largest shareholder of the corporation.[11] Defendants allege that Mullen caused Incredible Art to purchase approximately $60,000 worth of computers and related equipment (the "computer equipment") and then misappropriated this corporate asset by using it for his own and his

9. Mullen has assigned his claim against defendants arising out of the MBNA credit card liability to the plaintiff, Emerald.

10. We note, finally, that in their Answer, defendants asserted two counterclaims against Emerald. In the first, defendants argue that Emerald breached the Consulting Agreement by failing to fulfill its obligations thereunder. We have previously found that Emerald did not breach the consulting agreement, Part II.A.2, *supra*, and, therefore, we reject this counterclaim and deny defendants any relief. In their second counterclaim, defendants as-

sert that they would be entitled to legal and other fees if they prevail in the lawsuit under the terms of the Consulting Agreement. Consulting Agreement ¶ 12. While this argument correctly describes the attorney's fees provision of the Consulting Agreement, as defendants have not prevailed, they are not entitled to any fees.

11. The relevant time period is from the founding of Incredible Art in 1998 until the closing of the SPA on December 12, 2000.

brother's personal use. Defendants further allege that Mullen sold some of the computer equipment and other "software and know how" developed by Incredible Art "at a cost of approximately $250,000" to Z Galleries, but that the proceeds were misappropriated by Mullen. Third Party Complaint ¶ 11. Finally, defendants allege that Mullen charged more than $36,000 in personal expenses on the MBNA credit card, and never reimbursed Incredible Art for those charges, also an alleged misappropriation of corporate assets.

Defendants failed to meet their burden of proof on any of these allegations. As to the allegation relating to the misappropriation of the computer equipment, defendants failed to introduce any evidence to support their claim. Indeed, the testimony of defense witness Kratz belies this assertion. Kratz testified that Mullen had computers shipped from Incredible Art's former offices in California to their new offices in New York. It is reasonable to infer that at least some of these computers were part of the computer equipment alleged to be missing.

The defendants have also failed to meet their burden as to the second allegation. The Z Galleries transaction was disclosed in the SPA and Mullen testified that he specifically informed GSH of the transaction. Mullen also testified that he was given express permission by GSH to make the sale and use the proceeds to, *inter alia*, pay liabilities Incredible Art owed to him and his brother. SPA at 25. This testimony was not refuted. Furthermore, defendants introduced no evidence to support their assertion that the "software and know how" sold to Z Galleries had been "developed by Incredible Art at a cost of approximately $250,000." Third Party Complaint ¶ 11.

Finally, as to the third allegation, regarding alleged improper personal use of Incredible Art's MBNA credit card, defendants introduced no evidence whatsoever on this subject.

As the foregoing discussion makes clear, we reject defendants' claim that Mullen violated a fiduciary duty to Incredible Art, and refuse to award any damages on the claim.[12]

### B. Third Party Claim for Misrepresentation

■ This claim arises out of the SPA. Defendants allege that Mullen made a material omission by failing to include a liability to WEB Results.com, Inc. ("WRI") for consulting services in the amount of $16,575 in Schedule 4(g).[13] SPA at 22. Defendants further allege that Mullen also made an overt misrepresentation in Schedule 4(g) by stating that, while MBNA had billed Incredible Art for $7,200, that amount "has been disputed" because Mullen and Incredible Art had "never contested or disputed such charge to MBNA." *Id.*; Third Party Complaint ¶ 30.

We consider the second allegation first. Mullen's testimony that he had, in fact, disputed the MBNA charges because Incredible Art had been billed twice for the same charges was not challenged and was

---

**12.** Defendants' second and third claims against Mullen are exact duplicates of the one discussed in this section, except for the legal theories on which they are founded. The second claim alleges that Mullen defalcated, or embezzled, property and assets of Incredible Art, and the third claim alleges that Mullen converted property and assets of Incredi-

ble Art. Third Party Complaint ¶¶ 19–24. These claims are founded on the same factual allegations described herein, and we reject these claims for the same reasons.

**13.** Schedule 4(g) of the SPA lists Incredible Art's liabilities as of December 12, 2000. SPA at 22.

otherwise credible. Therefore, based on the evidentiary record, we find that there was no misrepresentation.

■ As to the alleged omission of a liability owed to WRI, Mullen testified to the following facts, and again defendants have offered no evidence or testimony on the issue. Incredible Art hired WRI to deliver Internet traffic to its website, "Incredibleart.com," in the hope that increased traffic would translate into increased sales of art. WRI invoiced Incredible Art for its services, claiming to have delivered an impressive 28,000 "hits," and requested payment. Incredible Art was suspicious, however, because their sales had not increased in proportion to the increase in traffic. When questioned by Incredible Art, WRI offered their own Internet traffic logs as the "proof" of the traffic sent to Incredibleart.com. Upon investigation, however, employees of Incredible Art discovered that WRI had not only doctored their logs, but had also marketed Incredibleart.com as a pornographic website. Thus, Internet users who entered, say, "photographs of naked women," into a search engine would be directed to Incredibleart.com. As these users were searching for a product that Incredible Art did not sell, the expected sales increase did not follow. Incredible Art confronted WRI with its findings, made it clear that would not pay, and even threatened to go public with WRI's scheme. By the end of June, 2000, WRI stopped trying to collect, and neither Mullen nor Incredible Art had heard from WRI thereafter.

Mullen testified that he made no mention of the WRI invoice on Schedule 4(g) of the SPA because he honestly believed that it was not a "live" liability. We find Mullen's belief reasonable and his explanation satisfactory, and we thus find no misrepresentation or material omission in his failure to disclose this alleged liability. Moreover, Mullen testified that he disputed the WRI invoice in writing, and that this document was available to GSH before the closing so that it could review it as part of its "due diligence." GSH counsel Membrado testified, however, that employees of GSH specifically told him that they were not interested in exhaustive due diligence in connection with the SPA. GSH was perfectly free to acquire Incredible Art in such a manner, but it cannot look to the Court at this late date to fix a problem it created for itself.[14]

## IV. CONCLUSION

To summarize, we award damages to Emerald in the amount of $83,333.32. Incredible Art and GSH are jointly and severally liable for this amount, and they shall also pay interest on this sum, at a rate of 9% per annum, accruing from May 29, 2001. We also award attorney's fees to plaintiff, in an amount to be determined at a later date. Incredible Art and GSH are jointly and severally liable for these fees as well. Furthermore, we find Incredible Art liable for any amount due on the MBNA credit card, subject to any meritorious defenses held by it or Mullen. Finally, we reject all of Incredible Art's and

14. Except for the legal theory on which it is founded, defendants' final claim against Mullen is a carbon copy of the one discussed in this section. This claim alleges that Mullen intentionally or negligently misrepresented to GSH the accounts payable of Incredible Art by failing to disclose the alleged liability to WRI in Schedule 4(g) the SPA, and that GSH relied upon such misrepresentation to its detriment. Third Party Complaint ¶¶ 33–37. As this claim is founded on the same factual allegations described herein, we reject it for the same reasons.

GSH's counterclaims and third party claims on the merits.

**IT IS SO ORDERED.**